IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENN TANK LINES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LIBERTY SURPLUS INSURANCE | : | No. 10-cv-178 |
| CORPORATION | : | |

**MEMORANDUM**

**Legrome D. Davis, J.**                                                                    **May 27, 2011**

This action arises from an insurance claim by Plaintiff Penn Tank Lines, Inc. ("Penn

Tank") under a claims-made pollution liability policy issued by Defendant Liberty Surplus

Insurance Corporation ("LSI"). The parties have filed cross-motions for summary judgment to

determine whether Penn Tank is entitled to indemnification under the insurance policy. Penn

Tank's Motion will be granted in part and denied in part, and LSI's Motion will be denied.

I.        PROCEDURAL AND FACTUAL BACKGROUND

Penn Tank transports gasoline and other fuels by truck throughout the United States.[1] On

March 24, 2006, a Penn Tank truck overturned in a single vehicle, rollover accident on Interstate

95 in Melbourne, Florida.[2] The truck driver, Joseph DeSimone, was killed. The truck's cargo of

8,800 gallons of gasoline and the truck's diesel fuel spilled along the roadway.[3] Penn Tank

maintains that its liability for the costs to clean up the gasoline is insured and LSI disclaims any

duty to indemnify Penn Tank under the policy.

On January 8, 2010, Penn Tank filed suit in the Court of Common Pleas of Philadelphia

---

[1] Compl. ¶ 6; Affidavit of John McSherry, Pl. Mot., Ex. 1, Doc. Nos. 17-1, 17-2, and 17-3 ("J. McSherry Aff.") ¶ 2.

[2] Compl. ¶ 7; Answer ¶ 7; J. McSherry Aff. ¶ 3.

[3] Compl. ¶ 8; Answer ¶ 8; J. McSherry Aff. ¶¶ 4, 5.

County. On January 14, 2010, LSI removed the action to this Court. The Complaint alleges that LSI breached its insurance contract to pay for clean-up costs from the accident (Count I), was unjustly enriched by its wrongful retention of policy proceeds (Count II), and declined indemnity in bad faith (Count III). By June 22, 2010 Order (Doc. No. 11), the Court granted LSI's motion to dismiss Counts II and III. On October 1, 2010, discovery closed. On October 15, 2010, Penn Tank and LSI filed the instant cross-motions for summary judgment. (Doc. Nos. 16, 18.)

Spanning the period from July 1, 2002, to July 1, 2008, LSI insured Penn Tank under three consecutive "Contractors Pollution Liability" policies, each insuring a two-year policy period.[4] The policies insured liability claims first made against Penn Tank during the policy period and reported to LSI as required by the policy terms.

Penn Tank also procured insurance through FS Insurance, Ltd. ("FS Insurance"), a captive specialty insurer for its member companies in the trucking industry.[5] Discover Re underwrote the policies procured through FS Insurance using several insurance carriers. In 2000, one of those carriers, Discover Property & Casualty Insurance Company, issued to Penn Tank a policy ("Discover Re policy") that provided insurance for trucking and automobile liability, among other coverages, on a per "accident" basis.[6] The policy insured "covered pollution cost or

---

[4] J. McSherry Aff. ¶ 6. The LSI policies were issued for the periods: July 1, 2002 to July 1, 2004 ("2002-04 policy"), July 1, 2004 to July 1, 2006 ("2004-06 policy"), and July 1, 2006 to July 1, 2008 ("2006-08 policy"). The parties agree that the policy terms at issue in this litigation are those included in the 2006-08 policy, Pl. Mot., Ex. 2, Doc. No. 17-3; Sullivan Decl., Ex. A, Doc. No. 22-4.

[5] J. McSherry Aff. ¶¶ 10, 13; Apr. 28, 2010 John McSherry Deposition Transcript ("J. McSherry Dep."), 25:17-23, 26:16-27:12, Sullivan Decl., Ex. B, Doc. No. 22-4; Def. Mot., Ex. C, Doc. No. 18-6.

[6] J. McSherry Aff. ¶¶ 10-11.

expense" resulting from the ownership, maintenance or use of insured trucks.[7]  The Discover Re policy was renewed annually through July 1, 2008.

Marsh USA, Inc. ("Marsh") acted as Penn Tank's insurance broker for all of its insurance policies.[8]  Penn Tank used Marsh's services in the purchase of the LSI policies and renewals of the LSI and Discover Re policies.[9]  Marsh also managed the insurance program of FS Insurance.[10]  Gallagher Bassett Services, Inc. ("Gallagher Bassett") was the third-party administrator contracted by Penn Tank to handle its liability claims under the Discover Re policy.[11]  Penn Tank reported those claims directly to Gallagher Bassett.[12]

On March 24, 2006, Penn Tank, through Gallagher Bassett, reported the accident to FS Insurance, submitting a detailed report that stated:  "Our Safety Department presently on the scene – Gasoline spill from loaded trailer being cleaned up."[13]  FS Insurance agreed to pay for the initial clean-up of the gasoline spill.[14]  Penn Tank employed Florida Environmental Regulation Specialists ("FER") to address the spill.  The day of the accident, FER and the Florida Department of Environmental Protection ("FDEP") inspected the site.  FER, using various contractors, performed primary clean-up work at the site during March 27-31, 2006.  Some tons

---

[7] Discover Re Policy for period, July 1, 2005 to July 1, 2006, Def. Mot., Ex. D-1, Doc. No. 18-7 at 22-53.

[8] J. McSherry Aff. ¶ 14.

[9] J. McSherry Dep., 36:2-16.

[10] J. McSherry Dep., 35:13-14.

[11] J. McSherry Aff. ¶ 15.

[12] J. McSherry Dep., 18:10-22.

[13] J. McSherry Aff. ¶ 16; Accident report, J. McSherry Aff., Ex. A; Def. Mot., Ex. E, Doc. No. 18-12 at 6; Nov. 5, 2010 Stephen McSherry Affidavit ("S. McSherry Aff.") ¶ 4, Doc. No. 20, Ex. 20.

[14] J. McSherry Aff. ¶ 17; S. McSherry Aff. ¶ 5.

of contaminated soil were removed and replaced with clean fill.[15]  During April to June 2006,

FER prepared invoices for the primary clean-up, a total of  $278,152.23.[16]  FER submitted the

invoices to Gallagher Bassett, FS Insurance paid the invoices under the General Re policy, and

Gallagher Bassett issued the payments to FER on behalf of Penn Tank.[17]  No demand for money

was made against Penn Tank for costs to clean up the spill.[18]

On March 30, 2006, Penn Tank's safety director, Steven Chastain, and FER's

environmental manager, Richard Boik, inspected the accident site.  The next day, Chastain

reported to Penn Tank's risk control manager, William Parlaman, providing a detailed

description of the site.  Chastain reported that gasoline had entered the water table and

approximately 20,000 gallons of water would have to be removed from the site.  He also reported

Boik's opinion that given the amount of contamination, clean-up efforts realistically would not

achieve a level of "Ground Water Clean."  Boik planned to install monitor wells and "hope[d]"

clean-up efforts would reach the level of "Natural Attenuation," noted as a level that "allows for

the natural process to breakdown the remaining product contamination and not require any

additional clean up, other than regular monitoring for a period of time."[19]  As of March 31, 2006,

Penn Tank's CEO, John McSherry, had been advised that clean-up costs at the site would be

---

[15]  May 24, 2006 FER Petroleum Spill Cleanup/Source Removal Report ("Source Removal Report"), Sullivan Decl., Ex. G, Doc. No. 22-5 at 38; J. McSherry Aff. ¶ 18.

[16]  FER invoices, Sullivan Decl., Ex. C, Doc. No. 22-5; Def. Mot., Ex. J, Doc. No. 18-13.

[17]  J. McSherry Aff. ¶¶ 18-20; Apr. 17, 2006 Boik email, Sullivan Decl., Ex. D, Doc. No. 22-5; May 4, 2006 Gordner email, Sullivan Decl., Ex. E, Doc. No. 22-5; June 28, 2006 Parlaman email, Sullivan Decl., Ex. F, Doc. No. 22-5; S. McSherry Aff. ¶¶ 6, 7.

[18]  S. McSherry Aff. ¶ 8.

[19]  Mar. 31, 2006 Chastain email, Sullivan Decl., Ex. K, Doc. No. 22-5; Def. Mot., Ex. G, Doc. No. 18-12 at 10-11.

$400,000, and perhaps more.[20]

Boik, on behalf of Penn Tank and Gallagher Bassett, prepared a Source Removal Report, dated May 24, 2006. In that report, FER recommended "further assessment of groundwater to establish if any constituents of petroleum hydrocarbons exceed FDEP Groundwater Cleanup Target Levels, and assess the extent of those levels at the spill location."[21] On May 24, 2006, Boik forwarded the Source Removal Report to the FDEP.[22]

The LSI policy issued for the July 1, 2004 to July 1, 2006 period ("2004-06 policy") was renewed under a new policy number effective July 1, 2006 ("2006-08 policy"). From the date of the accident through the renewal of the LSI policy, Penn Tank did not receive any notice from the FDEP or any other Florida environmental agency concerning Penn Tank's potential responsibility for the gasoline spill.[23] During that time, Penn Tank also did not receive any demand from any person asserting that it was responsible for cleaning up the spill.[24]

The renewal was obtained in June 2006 by Marsh's vice president, Jeffrey Conway, who communicated with an underwriter of Liberty International Underwriters ("LIU"), Brian Hegarty. On June 1, 2006, LIU emailed Marsh, asking for information about Penn Tank's operations for purposes of developing a renewal quotation and stating, "application is attached." The email does not reflect such an attachment. Marsh responded by email, providing information,

---

[20] J. McSherry Dep., 62:12-21; Mar. 29, 2006 Chastain email, Sullivan Decl., Ex. K, Doc. No. 22-4; Def. Mot., Ex. G, Doc. No. 18-12.

[21] May 24, 2006 FER Source Removal Report, Sullivan Decl., Ex. G, Doc. No. 22-5, Def. Mot., Ex. H, Doc. No. 18-12 at 18.

[22] May 24, 2006 Boik letter, Sullivan Decl., Ex. S, Doc. No. 22-6.

[23] S. McSherry ¶ 9.

[24] S. McSherry ¶ 10.

forwarding numerous documents, and stating, "[c]ompleted application to follow."[25]  Marsh's

submission included information about Penn Tank's previous trucking accidents.[26]  Marsh's

submission also attached a trucking application that Penn Tank had completed for another

carrier.  The trucking application listed a loss for the March 24, 2006 accident involving Mr.

DeSimone.[27]  On June 8, 2006, LIU provided a renewal quotation, having received Marsh's

submission with the completed trucking application, but without having received a completed

LIU application form.[28]  On June 27, 2006, LIU bound coverage for the LSI July 1, 2006-08

policy, forwarding to Marsh a binder that stated:

> CONTINUATION OF COVERAGE SUBJECT TO:
>
> 1.      The receipt of a signed and dated Liberty International Underwriters
>
>         Application including all relevant attachments.[29]

Before LIU bound coverage for the 2006-08 policy, Penn Tank did not notify LSI of the

gasoline spill.  The record does not suggest that Marsh, FS Insurance, or Gallagher Bassett

provided any such notice to LSI.  Before LIU bound coverage, Penn Tank did not believe that it

had or might have any liability for environmental loss or damage from the March 24, 2006

---

[25]  June 1, 2006 Hegarty email, Sullivan Decl., Ex. L, Doc. No. 22-6; Def. Mot., Ex. U, Doc. No. 18-15.

[26]  J. McSherry Aff. ¶ 24.

[27]  J. McSherry Aff. ¶ 25, Ex. B, Doc. No. 17-1 at 30 ("Joseph DeSimone EE was injured in an auto accident"); Sept. 28, 2010 Jeffrey Steven Conway Deposition Transcript, 65:3-10, 66:11-14.

[28]  June 8, 2006 Hegarty and June 13, 2006 Conway emails, Def. Mot., Ex. V, Doc. No. 18-16.

[29]  June 27, 2006 LIU binder, Sullivan Decl., Ex. M, Doc. No. 22-6; Def. Mot., Ex. W, Doc. No. 18-16.

accident.[30]  Also, Penn Tank did not believe that it might pursue a claim under an LSI policy because FS Insurance had accepted coverage for clean-up expenses from the accident without any reservation of rights to decline coverage.[31]  Before LIU bound coverage, no property owner, state or local agency, or other third-party had asserted that Penn Tank was responsible for environmental loss or damage from the accident.[32]

On September 28, 2006, the FDEP wrote to Penn Tank, stating that FER's Source Removal Report

> adequately documented the source removal activities, but the extent and magnitude
> of the soil and groundwater contamination have not been adequately defined. . . .
> Because petroleum contamination associated with the March 24, 2006 discharge still
> exists, we are referring this incident to the Brevard County Natural Resources
> Management Office . . . a complete assessment will need to be conducted and a Site
> Assessment Report (SAR) will need to be submitted . . . .[33]

This was the first notice to Penn Tank from any environmental agency that Penn Tank might be responsible for environmental loss or damage from the accident.[34]

At some point during October to November 2006, Discover Re began to question its

---

[30]  J. McSherry Aff. ¶ 27.

[31]  J. McSherry Aff.¶ 28.

[32]  J. McSherry Aff. ¶¶ 29, 30, 42.

[33]  Sept. 28, 2006 FDEP letter, J. McSherry Aff. ¶ 31, Ex. C; Sullivan Decl., Ex. T, Doc. No. 22-6.

[34]  J. McSherry Aff. ¶ 31.

obligation to insure the clean-up costs, as reflected in discussions among representatives of Discover Re, Gallagher Bassett, and Marsh.[35]  According to a Marsh representative, Discover Re took the position that Gallagher Bassett "should be expediting the resolution of Penn's obligations relative to clean up and pursuing reimbursement from the pollution carrier [LSI]."[36] At this time, however, Discover Re did not issue a written disclaimer of coverage.  Penn Tank first learned that FS insurance would not pay any future clean-up costs at some point in November to December 2006.[37]  By that time, Discover Re had paid $348,894.70 for clean-up costs.  Discover Re made no further payments.

On November 30, 2006, Marsh's vice president, Conway, informed Penn Tank's CEO, McSherry, that the only outstanding renewal requirement was a completed LIU application. Conway forwarded to McSherry a partially completed application form, asking McSherry to review and complete the information on the form, sign and date the application July 1, 2006, and send it back to Conway for transmission to LIU.[38]  The application contained the following question number 29, which someone eventually answered by checking "no":

> Is the applicant aware of the following:  any circumstances or any allegations of
>
> the applicant's liability, or any allegations of an act, error, or omission in the
>
> performance of the applicant's services which may result in any claim, suit, or

---

[35]  Oct. 25, 2006 Gordner email, Def. Mot., Ex. O, Doc. No. 18-13; Nov. 7, 2006 email chain, Def. Mot., Ex. P, Doc. No. 18-14.

[36]  Nov. 29, 2006 Langford email, Def. Mot., Ex. Q, Doc. No. 18-14 (stating also, "I would be very surprised if there weren't endorsements intended to extend coverage for [Penn Tank] for these kinds of incidents given the likelihood of this happening in their business.").

[37]  J. McSherry Aff. ¶ 33.

[38]  Nov. 30, 2006 email, J. McSherry Aff. ¶ 44, Ex. J; Sullivan Decl., Ex. O, Doc. No. 22-6; Def. Mot., Ex. X, Doc. No. 18-16.

demand for money or services against the applicant or any person or entity for who the coverage is sought? If yes, please explain.

PLEASE NOTE THAT THE POLICY SHALL NOT APPLY TO SUCH REPORTED CLAIMS OR CIRCUMSTANCES, UNLESS SCHEDULED ONTO THE POLICY BY ENDORSEMENT.[39]

At deposition, McSherry testified that when he signed the application, he was aware of the gasoline spill.[40] He does not know if he checked off any of the boxes in the application.[41]

On December 21, 2006, Brevard County Natural Resource Management Office ("Brevard County") wrote to Penn Tank, advising that Penn Tank was required to perform a site assessment and site assessment report by February 24, 2007, and that a failure to do so "may result in formal enforcement action."[42] On December 26, 2006, Marsh on behalf of Penn Tank, notified LSI of the March 24, 2006 accident, the involvement of Florida's environmental agency, the clean-up costs, and "the possibility that further clean-up expenses will be incurred to have a ground water assessment completed."[43] On January 23, 2007, LIU acknowledge receipt of the notice, and on February 14, 2007, requested further information. In response on April 16, 2007, Marsh

---

[39] LIU application, Sullivan Decl., Ex. H, Doc. No. 22-5 at 67; Def. Mot., Ex. Y, Doc. No. 18-16 at 41.

[40] J. McSherry Dep., 91:1-23; Sullivan Decl., Ex. B, Doc. No. 22-4; Def. Mot. Ex. C, Doc. No. 18-6.

[41] J. McSherry Aff. ¶ 45.

[42] J. McSherry Aff. ¶ 34, Ex. D.

[43] Dec. 26, 2006 Bailey letter, McSherry Aff. ¶ 35, Ex. E; Sullivan Decl., Ex. I, Doc. No. 22-5; Def. Mot., Ex. Z, Doc. No. 18-16.

provided information to LIU, including the December 21, 2006 Brevard County letter.[44]

On April 30, 2007, Gallagher Bassett informed Penn Tank that Discover Re disclaimed coverage for clean-up costs, quoting the policy's pollution exclusion no. 11, with no other explanation.[45] FS Insurance demanded that Penn Tank repay the amounts already received for clean-up costs at the accident site.[46] Penn Tank demanded that Discover Re rescind its coverage position,[47] but Discover Re did not do so.

On April 30, 2007, LSI through LIU denied coverage, and on May 1, 2007, reaffirmed its denial of coverage, under both the 2004-06 and 2006-08 policies for liability arising from the March 24, 2006 accident.[48] LSI based its declination on multiple grounds. Among those reasons, LSI concluded in regard to the 2004-06 policy that a claim was made against Penn Tank in March to June 2006, but was not reported to LSI within the policy period.[49] In regard to the

---

[44] Jan. 23, 2007 LIU letter, Sullivan Decl., Ex. P, Doc. No. 22-6; Def. Mot., Ex. AA, Doc. No. 18-16; Feb. 14, 2007 Papazian letter, J. McSherry Aff. ¶ 36, Ex. F; Sullivan Decl., Ex. Q, Doc. No. 22-6; Def. Mot., Ex. BB, Doc. No. 18-17; April 16, 2007 Bailey email, Sullivan Decl., Ex. R, Doc. No. 22-6; Def. Mot., Ex. CC, Doc. No. 18-17; Dec. 21, 2006 Brevard County letter, J. McSherry Aff. ¶ 37, Ex. F.

[45] Apr. 30, 2007 Gordner letter, Def. Mot., Ex. R, Doc. No. 18-14.

[46] J. McSherry Aff. ¶ 38.

[47] Aug. 8, 2007 Parlaman letter, Def. Mot., Ex. S, Doc. No. 18-14; Aug. 9, 2007 Gordner email, Def. Mot., Ex. T, Doc. No. 18-14

[48] April 30 and May 1, 2007 LIU letters, J. McSherry Aff. ¶ 39, Exs. H, I; Def. Mot., Ex. DD, Doc. No. 18-17.

[49] J. McSherry Aff. ¶ 40 ("In the May 1, 2007 letter, Liberty equated the 'occurrence' of the Truck Accident with a 'claim'."). At deposition, Edmund Papazian, LIU's claims attorney testified: "I've been a lawyer for 30 years. As soon as you have that spill, there's a claim." When asked: "Would it be fair to say that when you made your coverage decision that you determined that the date of the occurrence, meaning the overturn and spill of March 24, 2006, was the same date as the date a claim was made against Penn Tank as that term is defined in the policy?", Papazian answered: "Yes." Apr. 8, 2010 Edmund Papazian Deposition Transcript, 55:16-18, 56:2-12, 127:8-22, Pl. Mot., Ex. A, Doc. No. 16-1. In response to Penn Tank's Request for Admission and Interrogatory No. 5, LSI answered: "The FER Invoice dated April 17, 2006 is a written demand, received by Penn Tank Lines, which asserts responsibility on the part of Penn

10

2006-08 policy, LSI concluded that Penn Tank knew or should have known that a claim might arise from the gasoline spill, but failed to timely disclose those circumstances. LSI also decided Penn Tank had made material misrepresentations in the July 1, 2006 renewal process justifying a potential action to rescind the 2006-08 policy.

On November 23, 2009, Penn Tank requested reconsideration of LSI's declination of coverage. Penn Tank also informed LSI that the State of Florida had requested additional remedial measures to clean up the site, which Penn Tank estimated would be in excess of $700,000.00.[50] In response on December 15, 2009, LIU, on behalf of LSI, wrote to Penn Tank's attorney, reaffirming the declination.[51]

## II.    LEGAL STANDARD

Under Pennsylvania law, which the parties agree applies here, the interpretation of an insurance contract regarding coverage is generally performed by the court. Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 290 (Pa. 2007); Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" for purposes of a summary judgment motion if a dispute over that fact

---

Tank Lines for a loss." LSI's discovery responses, Pl. Mot., Ex. B, Doc. No. 16-1.

[50] Nov. 23, 2009 Bodzin letter, Def. Mot., Ex. EE, Doc. No. 18-17.

[51] Dec. 15, 2009 Papazian letter, Def. Mot., Ex. FF, Doc. No. 18-17.

"might affect the outcome of the suit under the governing law." Id. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence at trial, it would be insufficient to permit the non-moving party to carry its burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, speculation, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). In determining whether summary judgment is appropriate, "we must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Stratechuk v. Bd. of Educ., South Orange–Maplewood Sch. Dist., 587 F.3d 597, 603 (3d Cir. 2009) (internal quotation marks and citations omitted), cert. denied, 131 S. Ct. 72 (U.S. 2010).

In regard to a claims-made policy, the insured bears the burden at trial of proving compliance with policy notice of claim provisions and reporting requirements as a condition precedent to coverage. Ace Am. Ins. Co. v. Underwriters at Lloyds and Cos., 939 A.2d 935, 940 (Pa. Super. Ct. 2007) (notice of a claim is a condition precedent to coverage and not a limitation of coverage), aff'd, 971 A.2d 1121 (Pa. 2009). The insurer carries the burden of proving the applicability of any exclusions or limitations on coverage. Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999); Miller v. Boston Ins. Co., 218 A.2d 275, 277 (Pa. 1996) ("[a] defense based on an exception or exclusion in a policy is an affirmative one, and the

burden is cast upon the defendant to establish it"); <u>Wall Rose Mut. Ins. Co. v. Manross</u>, 939 A.2d 958, 962-63 (Pa. Super. Ct. 2007), <u>appeal denied</u>, 946 A.2d 688 (Pa. 2008); <u>Koppers Co., Inc. v. Aetna Cas. & Sur. Co.</u>, 98 F.3d 1440, 1446 (3d Cir. 1996).

III.   <u>DISCUSSION</u>

The LSI policy insures Penn Tank against liability for claims made against it as a result of its truck operations throughout the United States.[52]  <u>See</u> <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2002) ("The primary aim of third-party insurance is to defend and indemnify insureds against liability for claims against them as a result of their own conduct.").  Thus, the  LSI policy indemnifies Penn Tank for sums it becomes legally obligated to pay for claims made against it by third-parties asserting that Penn Tank's operations caused pollution:

> We will pay on your behalf those sums the "insured" becomes legally obligated to pay for "loss" arising from "claims" resulting from "pollution conditions" caused by "covered operations" performed by the "insured" or any entity for which the "insured" is legally liable.[53]

The parties agree that the LSI policy insures claims first made against Penn Tank during the policy period, provided Penn Tank reported the claim during the policy period or any applicable extended reporting period.[54]  The parties also agree that the LSI policy would insure Penn Tank's

---

[52]  2006-08 LSI Policy, Declarations, Covered Operations, Pl. Mot., Ex. 2, Doc. No. 17-3 at 2; Sullivan Decl., Ex. A, Doc. No. 22-4 at 2.

[53]  2006-08 LSI policy, Section I- Coverages, Insuring Agreement, Pl. Mot., Ex. 2, Doc. No. 17-3 at 12; Sullivan Decl., Ex. A, Doc. No. 22-4 at 13.

[54]  <u>Id.</u>

13

liability for a claim made against Penn Tank as a result of one of its trucks accidentally spilling gasoline along the roadway, provided all policy requirements were met. LSI, however, disclaims any obligation to indemnify Penn Tank for its liability for the March 24, 2006 accidental spill based on the following policy terms, conditions, and an exclusion.

A.    A Claim Against Penn Tank Was First Made and Reported During the 2006-08 LSI Policy Period

According to LSI, the March 24, 2006 accident and the FER invoices issued during April-June 2006 constitute a claim made against Penn Tank during the 2004-06 policy period. LSI disclaims coverage because the accident and invoices were not reported to LSI during that policy's period. According to Penn Tank, its liability for the spill is insured because a claim was first made against it by the FDEP on September 28, 2006, at the earliest, and certainly on December 21, 2006, which claim was timely reported to LSI on December 26, 2006, within the 2006-08 policy period. The question of when the "claim" was first made turns on the LSI policy definition of "claim" as "a written demand received by the 'insured' seeking a remedy or asserting liability or responsibility on the part of the 'insured'."[55]

The truck accident is not a claim within the meaning of the LSI policy, which insures claims first made against Penn Tank, not acts or events that take place, during the policy period. See Kvaerner, 908 A.2d at 892 n.1 ("An 'occurrence' policy protects the policyholder from

_____

[55] The LSI policy defines "claim" in pertinent part as follows:

"Claim" means a written demand received by the "insured" seeking a remedy or asserting liability or responsibility on the part of the "insured" for "loss".

2006-08 LSI policy, Section VII-Definitions, Pl. Mot., Ex. 2, Doc. No. 17-3 at 23; Sullivan Decl., Ex. A, Doc. No. 22-4 at 24.

liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." (internal quotation marks and citations omitted)); McMillen Eng'g, Inc. v. Travelers Indem. Co., 744 F. Supp. 2d 416, 423 (W.D. Pa. 2010) (slippage of lateral ground support was not a claim made against the engineering services provider); Bensalem Twp. v. W. World Ins. Co., 609 F. Supp. 1343, 1348 (E.D. Pa. 1985) (a "claim" is "a demand for something as of right'") (internal quotation marks and citation omitted)).

The FER invoices also are not a "claim" within the meaning of the LSI policy. Although written, the invoices do not meet the definition of a "claim" within the meaning of the insuring agreement of the LSI policy. They demand payment, but not a legal remedy from Penn Tank for services rendered by FER or other contractors at the accident site. They do not assert Penn Tank's legal liability for the gasoline "pollution conditions" caused by Penn Tank's truck at the accident site or by any entity for which Penn Tank is legally liable. See City of Pittsburgh v. Am. Asbestos Control Co., 629 A.2d 265, 269 (Pa. Commw. Ct. 1993) (workers compensation claim, even if brought against the insured within the policy period of a claims-made general liability policy, was not a claim within the policy's insuring agreement); McMillen, 744 F. Supp. 2d at 423, 425 (invoice demanding payment from the insured for costs incurred in repairing damage to a highway, but not asserting the insured's negligence, did not constitute a "claim").

The FDEP's September 28, 2006 letter was the first notice to Penn Tank that Florida might hold Penn Tank responsible for environmental contamination resulting from the accident. The letter did not request money or assert Penn Tank's liability for the contamination that remained at the site. Instead, the letter advised Penn Tank that the matter was being referred to Brevard County and a complete assessment would need to be conducted. At most, this letter

provided notice that Penn Tank might be exposed to a claim to follow. Brevard County's December 21, 2006 letter was the first demand that Penn Tank take action to address the spill's impact on the environment. Brevard County advised that a failure to conduct a site assessment by February 24, 2007 might result in a formal enforcement action and demanded a written response from Penn Tank in 30 days. On December 26, 2006, Penn Tank reported the claim to LSI within the 2006-08 policy period.

Before Penn Tank received Brevard County's December 21, 2006 letter, no property owner, state or local agency, or other third-party had asserted that Penn Tank was responsible for environmental loss or damage from the accident. Therefore, the undisputed facts show as a matter of law that no claim was made against Penn Tank during the 2004-06 policy period, and a claim was made against Penn Tank and reported to LSI during the 2006-08 policy period.

B.     Issues of Fact Remain as to Application of the "Known Circumstances and Non-Disclosure" Exclusion and Penn Tank's Duty to Notify LSI of the Gasoline Spill

LSI contends that the policy exclusion for known pollution conditions that occur prior to the policy's inception, but are not disclosed to LSI before the policy's effective date,[56] precludes

---

[56] The LSI policy exclusion of "Known Circumstances and Non-Disclosure" provides:

This insurance does not apply to:
"Loss" arising from any "pollution conditions" caused by "covered operations" which occurred prior to the inception of this policy, if any "responsible insured" knew or could have reasonably foreseen that such "pollution conditions" would give rise to a "claim" and did not disclose such to us.

2006-08 LSI policy, Section II-Exclusions, Exclusion ¶ 7, McSherry Aff., Ex. 2, Doc. No. 17-3 at 14; Sullivan Decl., Ex. A, Doc. No. 22-4 at 15. The policy defines "responsible insured" as "an officer, director or partner of any 'insured'" or "the manager or supervisor of any 'insured' responsible for environmental affairs, control or compliance." 2006-08 LSI policy, Section VII-Definitions, McSherry Aff., Ex. 2, Doc. No. 17-3 at 25; Sullivan Decl., Ex. A, Doc. No. 22-4 at 26.

coverage for Penn Tank's liability resulting from the gasoline spill.  LSI also relies on a policy condition that  places on Penn Tank the duty to give written notice to LSI "as soon as practicable of any 'pollution conditions' which may reasonably result in a "claim'."[57]  These provisions do not require disclosure of all pollution incidents that occur before policy inception.  Instead, the insured is required to disclose only those pollution conditions it knew or could have reasonably foreseen would give rise to a claim within the policy's insuring agreement.

Pennsylvania courts have not directly addressed the interpretation and effect of these policy provisions.  Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302 (3d Cir. 2001) and Selko v. Home Ins. Co., 139 F.3d 146 (1998) addressed analogous exclusions under claims-made legal professional liability policies, applying "a mixed subjective/objective standard to determine whether claims were excluded from coverage."  Coregis, 264 F.3d at 306 (citing Selko, 139 F.3d at 152).  Although the LSI policy exclusion differs from the ones before Coregis and Selko, the holdings in those cases are applicable here insofar as they instruct a court to consider first the subjective knowledge of the insured and then the objective understanding of a reasonable insured with that knowledge.  This same standard will be applied here to determine what Penn Tank subjectively knew about the spill prior to renewal of its insurance on July 1, 2006, and with that knowledge, whether Penn Tank objectively could have reasonably foreseen that the spill would give rise to an environmental enforcement action.

There is no question that prior to July 1, 2006,  Penn Tank's CEO knew the accident had

---

[57]  The LSI policy condition, "Duties in the Event of any Incident, Circumstance, Event or Claim," provides in pertinent part:

> You must see to it that we are notified in writing as soon as practicable of any "pollution conditions" which may reasonably result in a "claim".

2006-08 LSI policy, Section V-Conditions, Duties ¶ 7(a), Sullivan Decl., Ex. A, Doc. No. 22-4 at 19.

occurred and some 8,800 gallons of gasoline had spilled along the roadway. At that time, he understood that clean-up costs could perhaps exceed $400,000. On March 30, 2006, Penn Tank's field safety supervisor inspected the accident site. On March 31, 2006, the supervisor informed Penn Tank's risk control manager that a 250 by 65 foot area, 5 to 7 feet in depth, had been contaminated, soil would need to be removed and replaced with clean fill, the groundwater had been impacted, some 20,000 gallons of water would have to be removed, and wells to monitor the groundwater would need to be installed. Penn Tank's supervisor and manager were also informed that all of the gasoline on the site could not be removed, but natural processes might breakdown any remaining contamination without the need for additional clean-up efforts other than monitoring. In the May 24, 2006 Source Removal Report prepared for Penn Tank, FER recommended further assessment of the groundwater.

Prior to July 1, 2006, Penn Tank had received no notices, demands, or communications from any third-party or Florida environmental agency concerning Penn Tank's responsibility for the spill. General Re had accepted coverage for the costs without any reservation of rights, and FS Insurance through Gallagher Bassett had paid all invoices submitted for clean-up costs. As far as Penn Tank was concerned, the initial spill had been cleaned up and adequately addressed by FER, and all clean-up costs had been fully insured and paid for by FS Insurance. Penn Tank did not expect any liability claim to follow.

Penn Tank's knowledge of the sheer magnitude, extent, and costs of the spill does not conclusively establish an inference that Penn Tank knew it was exposed to potential liability from the spill.[58] Moreover, whether or not Penn Tank was in compliance with all environmental

---

[58] Penn Tank contends that before July 1, 2006, it had no reason to believe the March 24, 2006 accident was any different from four previous claims submitted to FS Insurance for truck accidents that

rules and regulation is not a controlling factor. Penn Tank, as a reasonable insured trucking company, did not have an express insurance policy duty to be fully cognizant of all applicable laws and regulations at the peril of losing coverage for a pollution incident. The record does not suggest that Penn Tank was unreasonable in relying on FER's services and recommendations to address the contamination at the accident site.

Based on Penn Tank's knowledge prior to July 1, 2006, the primary issue to be decided is whether Penn Tank could have reasonably foreseen that the spill would be a basis of an environmental enforcement action. In this regard, the facts are not so clear that reasonable minds could not differ. A reasonable insured could not have been certain that natural processes would breakdown the remaining petroleum product without the need for additional clean-up. Knowing that some groundwater contamination remained that required monitoring, a reasonable insured might expect the need for additional assessment and corrective efforts. Similarly, because contamination still remained on the site after FER's initial work, a reasonable insured might have realized that oversight by Florida's environmental agencies was a possibility. LSI disputes that Penn Tank should have assumed that FER's efforts had completely resolved the problems presented by contamination of the groundwater. Thus, there are genuine issues of disputed material fact concerning whether Penn Tank could have reasonably foreseen that the spill would give rise to an environmental enforcement action.

LSI, the party moving for judgment based on the exclusion, bears the burden of proof at trial that the exclusion applies. In regard to the applicability of the exclusion, the evidence,

---

resulted in clean-up costs. FS Insurance paid those claims under the General Re policy, without Penn Tank incurring any further pollution liability. J. McSherry Aff. ¶¶ 38, 54. Because the facts about these prior accidents are not before the Court, any inferences based on those accidents would be speculative.

viewed in the light most favorable to the non-movant, Penn Tank, with all inferences drawn in Penn Tank's favor, could support a verdict that Penn Tank did not know or could not have reasonably foreseen that the spill would result in a liability claim. If a jury so found, Penn Tank's failure to disclose the circumstances surrounding the spill would not eliminate coverage for the FDEP's claim first made and reported during the 2006-08 policy period.

Penn Tank, the party moving for a declaration of its entitlement to indemnity under the policy, bears the burden of proof at trial that it complied with the policy duty to provide written notice as soon as practicable of any pollution conditions which might reasonably result in a claim. In this regard, the evidence, viewed in the light most favorable to the non-movant, LSI, with all inferences drawn in LSI's favor, could support a verdict that Penn Tank should have reasonably foreseen that the spill would result in a liability claim and Penn Tank did not timely provide notice. If a jury so found, Penn Tank's breach of its duty to notify LSI of the gasoline spill would eliminate coverage for the FDEP's claim first made and reported during the 2006-08 policy period.

Summary judgment is appropriate only if the evidence cannot reasonably support a verdict for the non-moving party. As a matter of law, LSI has not carried its burden to prove that the exclusion applies to preclude coverage, and Penn Tank has not carried its burden to prove its compliance with notice provisions for entitlement to indemnity under the policy. Accordingly, as to whether Penn Tank could have reasonably foreseen that the spill would give rise to a liability claim within the meaning of policy's insuring agreement, summary judgment will be denied.

C.     Penn Tank Has Not Forfeited Coverage by Statements or Representations Made in Connection With Its Application for Insurance

LSI contends that in the application for the 2006-08 policy, Penn Tank falsely answered "no" to question 29, which asked if Penn Tank was aware of any circumstances or allegations of its liability, which might result in any claim or demand against it. LSI contends that Penn Tank, by its false answer to question 29, breached the policy's condition of truthful representation,[59] thereby forfeiting insurance for its liability arising from the accident. It is not clear whether LSI seeks a remedy based on the policy's language or on a common law theory of rescission.[60] In either case, there is insufficient evidence for a reasonable jury to conclude that Penn Tank

---

[59] The LSI policy condition, "Representations," provides:

> By accepting this policy, you agree:
> The statements in the Declarations, the Application and any material submitted in connection with such Application, which are on file with us, are your agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between you and us or any of our agents relating to this insurance.

2006-08 LSI policy, Section V-Conditions, Representations, Pl. Mot., Ex. 2, Doc. No. 17-3 at 20; Sullivan Decl., Ex. A, Doc. No. 22-4 at 21.

[60] LSI denies that it "has sought to rescind or void any policy" and states that "this is not a rescission case." (Pl. Br., Doc. No. 22 at 25.) LSI asserts that it has "simply asked this Court to enforce the language of the insurance contracts as they were written." (Def. Br., Doc. No. 22 at 25.) Nonetheless, LSI marshals facts and presents arguments that appear to advance such a remedy. LSI reserved its rights to assert the defense of rescission based on Penn Tank's purported failure to disclose pollution conditions at the accident site. (April 30 and May 1, 2007 LSI letters, McSherry Aff., Exs. H, I.)

LSI buttresses this position with a fraud-based defense, asserting that Penn Tank purchased insurance for "a known loss which it knowingly failed to disclose to LSI." (Pl. Br., Doc. No. 18-3 at 21, 13-14, 23-24.) There is a "known loss" when "the evidence shows that insured was charged with knowledge which reasonably shows that it was, or should be, aware of a likely exposure to losses which would reach the level of coverage." Rohm & Haas Co. v. Continental Cas. Co., 732 A.2d 1236, 1258 (Pa. 2001). The record shows that Penn Tank knew that there was groundwater contamination at the site prior to the policy's inception. However, the record does not show that Penn Tank knew it was potentially liable for clean-up costs and knowingly failed to disclose material information about the gasoline spill. Material issues of fact remain as to whether Penn Tank reasonably should have been aware of a likely exposure to liability for clean-up costs. Whether Penn Tank should have been aware of a "known loss" remains for the fact finder to determine in regard to application of the policy's exclusion, "Known Circumstances and Non-Disclosure."

deliberately made a material misrepresentation that forfeited its insurance.

In June 2006, Penn Tank was aware of contamination remaining at the accident site. Although Marsh provided LSI with a trucking application that listed Mr. DeSimone's accident, neither Marsh nor Penn Tank notified LSI about the gasoline at the site. Based on the information provided by Marsh, LSI provided a renewal premium quotation and bound coverage on June 27, 2006. LSI never cancelled the binder because it had not received a completed application from Penn Tank. LSI issued a formal policy to Penn Tank, although the record is not clear when that took place. Thus, the record is not clear whether LSI issued the formal policy without having received a completed application. Some five months after coverage had been bound, Marsh presented Penn Tank with an application form for the policy. The signature of Penn Tank's CEO, McSherry, appears on the completed application, but he does not recall if he supplied any of the information or answered any of the questions in the application. The record does not establish when, if ever, the completed application was transmitted from Penn Tank or Marsh to LSI.

The validity of the binder issued by LSI through LIU did not depend on receipt of a completed application. A binder provides enforceable insurance pending investigation of the risk by the insurer until a formal policy is issued. Erie Ins. Exchange v. Lake, 671 A.2d 681, 685 n.7 (Pa. 1996); Strickler v. Huffine, 618 A.2d 430, 433 (1992) ("It is well settled in Pennsylvania that a binder constitutes evidence that insurance coverage has attached at a specific time and continues in effect until either the policy is issued or the risk is declined and notice thereof is given."), appeal denied, 637 A.2d 290 (Pa. 1993). "It is the custom of the insurance industry, and sound public policy, to provide on-the-spot temporary insurance coverage in the form of a binder

22

until the application information can be verified and a formal policy issued." <u>Klopp v. Keystone Ins. Cos.</u>, 595 A.2d 1, 4 n.5 (1991). LSI never canceled the binder or declined the risk because it had not received a completed application. By the time Brevard County asserted a claim against Penn Tank on December 21, 2006, Penn Tank's rights had vested, under either the binder or the 2006-08 policy replacing the binder. <u>See</u> <u>Fire & Cas. Ins. Co. of Conn. v. Ligon</u>, 86 Fed. App'x 517, 520 (3d Cir. 2004) (applying Pennsylvania law).

Penn Tank cannot be retroactively stripped of its vested rights unless and until LSI rescinds the policy based on information supplied in the application process. Thus, whether based on the common law remedy of rescission or the policy's condition of truthful representation, LSI's defense sounds in rescission based on alleged misrepresentation and fraud. "The burden of proving fraud is on the insurer who must prove, by clear and convincing evidence, that on the application, the insured knowingly made false statements or knowingly failed to disclose information which was material to the risk against which the insured sought to be protected." <u>Rohm & Haas Co. v. Continental Cas. Co.</u>, 732 A.2d 1236, 1251 (Pa. 1999). "In order to show a policy is void *ab initio* on the basis of fraud, the insurer must prove that the intent to deceive was deliberate." <u>Id.</u> (citing <u>Grimes v. Prudential Ins. Co. of Am.</u>, 585 A.2d 29, 33 (Pa. Super. Ct. 1991).

> Mere mistakes, inadvertently made, even though of material matters, or the failure to furnish all details asked for, where it appears there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown.

Grimes, 585 A.2d at 33 (internal quotation marks and citation omitted). "The clear and convincing standard of proof is sufficiently met if the evidence presented was 'so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Rohm & Haas, 732 A.2d at 1252 (quoting Lessner v. Rubinson, 592 A.2d 678, 681 (Pa. 1991) (internal quotation marks and citations omitted)).

Examination of the record does not disclose that the contamination at the site was material to the risk for which insurance was sought and bound. Although LSI requested an application, it relied on other information provided by Marsh to formulate a renewal premium quotation and bind coverage. Even though the binder stated that continuation of coverage was subject to receipt of an application, the record does not establish whether the formal policy was issued before or after LSI's receipt of an application. The record does not suggest that had LSI been informed about the spill, it would have charged an increased premium or it would not have issued the binder or the formal policy.

Examination of the record also does not disclose a deliberate intent on Penn Tank's part to deceive LSI. During the renewal process in June 2006, Penn Tank did not believe that it had any reason to pursue a claim under the LSI policy. General Re through FS Insurance had agreed to indemnify Penn Tank for the costs associated with clean-up of the site, without reservation of rights, and all invoices submitted for the costs were paid. Penn Tank had not received any notice, claim, or other demand that purported to hold it responsible for the spill. As far as Penn Tank was concerned, there was no information about the spill to disclose. Moreover, Penn Tank did not conceal information about the occurrence of Mr. DeSimone's accident, which was

included in the trucking application forwarded by Marsh to LSI.  Penn Tank did not believe that the spill could result in its liability until it received the FDEP's September 28, 2006 letter.  Even assuming Penn Tank's CEO answered question 29 in the application, which has not been shown, Marsh instructed Penn Tank to complete and post-date the application July 1, 2006, the effective renewal date.  Question 29 asked for a statement of what the insured was subjectively "aware."  The answer to question 29 is consistent with the facts Penn Tank believed to be true when coverage was bound and the policy became effective on July 1, 2006.

LSI, the party moving for judgment based on the policy condition of truthful representations, bears the burden of proof at trial, by clear and convincing evidence, that the condition was breached and the insurance procured should be rescinded.  LSI has failed to meet its burden of proof.  Accordingly, summary judgment will be entered in favor of Penn Tank on LSI's claims that Penn Tank knowingly made false statements or knowingly failed to disclose information which was material to the risk against which Penn Tank sought to be insured.

In accordance with the rulings above, summary judgment and a declaration of the parties' respective rights will be entered.  An appropriate Order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.